(No. 21327.—)

LeRoy Ashmore *et al.* Appellants, *vs.* Ella Newman *et al.* Appellees.

*Opinion filed October 22, 1932.*

GEORGE W. HUNT, WILLARD B. GASKINS, JOSEPH STOREY, WALLACE A. WALKER, and MANN & COLEMAN, (JAMES C. WOODBURY, guardian *ad litem*,) for appellants.

CASPER PLATT, HAROLD LINDLEY, M. F. KEEGAN, R. R. BOOKWALTER, JAMES A. MEEKS, and G. F. REARICK, for appellees.

Mr. JUSTICE DUNN delivered the opinion of the court:

E. R. E. Kimbrough, a resident of Vermilion county, died on July 28, 1930. He left surviving him no wife, child or other descendant, no brother, sister or descendant of brother or sister, and no uncle or aunt, they having all predeceased him. His heirs were seventeen cousins. He executed a will on January 8, 1929, which was admitted to probate and record at the September term, 1930, of the probate court of Vermilion county, and letters testamentary were issued to the First National Bank of Danville, the executor named in the will. The testator left a large amount of real estate and personal property, and on September 3, 1931, some of his heirs filed a bill in the circuit court of Vermilion county against the executor, the devisees and legatees and other heirs to construe the will. A demurrer was filed by the executor, the devisees and legatees, which was sustained. The complainants stood by their bill and it was dismissed for want of equity. They have appealed.

The will consisted of thirty numbered items. The prayer of the bill was that the court would construe the will, and particularly items 10, 13, 19, 20, 27, 28 and 29, with reference to their violation of the rule against perpetuities and offending against the Statute of Accumulations; that a decree might be entered determining the rights and interests of all the parties, requiring an accounting by the executor, holding items 10, 13, 19, 20, 27, 28 and 29 void as in violation of the rule against perpetuities, and that the property disposed of by each of those provisions of the will passes to the heirs-at-law of the testator under the Statute of Descent of this State, and in case of real estate, in accordance with the statute of the State in which such real estate is situated, and that the court would give to the complainants such other and further relief as equity might require.

The items of the will, other than those specifically indicated, direct the payment of debts and funeral expenses, state that the testator's family and near relatives have pre-

ceded him in death, and make a large number of bequests, mostly of money. The items in question are as follows:

"Item 10. I direct that my executor hereinafter named shall set apart twelve thousand dollars of bonds owned by me at the time of my death and pay the income arising therefrom, semi-annually, to my faithful colored friend, Frank E. Neal, so long as he lives. It is my express will that this sum shall be paid to him in person, that no part of the income shall be subject to execution, garnishment, payment of alimony or to the order of any court for any purpose whatever. It is my desire and will that this provision shall give to the said Neal the means of existence so long as he lives. In case any order of court tries to take any part of the income away from him for debt, alimony or other cause the said payment shall cease so long as such effort is made—and the fund hereby created shall become a part of my estate as hereinafter explained and its income disposed of. At the death of the said Neal the said fund shall be added to the principal of my estate. My said executor shall re-invest the principal as the items thereof mature from time to time so as to keep said fund intact during the life of said Neal.

"Item 13. I will and direct that my executor hereinafter named acting as my trustee shall maintain a fund of twenty-five hundred dollars and from the income from such fund keep my lots in Spring Hill Cemetery in good condition. They shall keep the graves in order and cause plants and flowers to be kept as I have done while living. Out of the principal of my estate said executor shall cause markers to be placed at the head of my grave and the grave of my sister, Laura, (if I have not done so while living) similar to the markers now on said lots.

"Item 19. I direct that my executor shall set aside two thousand dollars from any funds belonging to my estate, and keep the same invested in interest-bearing securities. The interest arising therefrom shall be paid annually, to

that member of the graduating class of the Danville high school whose rank is No. 1 of that year. The said fund to be known as the Kimbrough Prize. In case of a tie between two of such graduates, the fund shall be divided between them.

"Item 20. I direct that my executor shall set aside the sum of one thousand dollars from any funds belonging to my estate, and keep the same invested in interest-bearing securities. The income from such fund to be paid to the Vermilion county farm bureau to be used by such bureau, as a prize to be paid to that boy or girl who shall, in their judgment produce the best calf or the best pig, during such year. Said bureau to decide annually which kind of animal shall be the subject of competition among such boys or girls that year. The said fund shall be known as the Kimbrough Prize. In case said farm bureau shall cease to exist, this item shall lapse.

"Item 27. Subject to the trust herein set forth, I give, bequeath and devise to the First National Bank of Danville, Illinois, all the rest, residue and remainder of my estate, real, personal and mixed of whatever nature and kind and wherever situated subject to this express trust, viz.: To convert my real estate into cash or interest-bearing securities whenever the general business conditions of the country make it advisable or desirable to sell such real estate. At this time I own farm lands in Montgomery county, Alabama, Hale county, Ala., and Vermilion county, Illinois, aggregating about twenty-one hundred and eighty-three acres. When conditions appear favorable and a sale can be made of the Alabama lands it is my judgment my executor should sell such lands on terms part cash and balance secured by mortgage on land sold, with the option to the purchaser to pay all cash, if he desires. My judgment is said lands should not be sold for several years unless land values become more stable than they are now. On the Montgomery county farm I have a lot of livestock and other farm property. The place

is now being operated on a fifty-fifty per cent basis. My executor should examine into this business as it exists at my death and continue it if deemed prudent. If not continued then my executor will sell all my personal property there on the best terms they can and add the proceeds to the principal of my estate. One farm I own is in Newell township, Vermilion county, Ill. It is farmed now by Orlando Miller. I deem it prudent to retain this farm indefinitely. It is good property. It is my will that he be permitted to lease the land as long as he desires to lease it and the same shall not be sold so long as he desires to live on the farm. One farm is owned by R. D. Harvey and I as tenants in common. It is known as the Collison farm, located at Collison, Ill. My executor will join with Mr. Harvey in any prudent sale he may desire to make or hold the same with him so long as he wishes to hold it. This has cost us about one hundred thousand dollars. If Mr. Harvey desires to purchase my interest I direct my executor to convey my one-half interest to him for thirty thousand dollars. This is twenty thousand dollars less than it cost me. The Hale county Alabama farm of 344½ acres cost me seventeen thousand dollars and was acquired by foreclosure of a trust deed. It is a very good farm—excellent for a dairy and should bring at least what it cost me when farming conditions are normal. It has always brought in some net rent and will pay its way while holding it. By inheritance I have become the sole owner of the family homestead, located on the northeast corner of Vermilion and Seminary street, in Danville, Illinois. It has a frontage of one hundred feet on Vermilion street. My judgment is this property has a future and will gain in value as the city grows. It will rent for enough to carry it. Unless a very good sale can be made after my death, I advise holding this corner to see what Danville will do in the next ten years. As fast as my estate is converted into cash I direct my executor to invest the same in good securities, such as bonds, mortgages,

stock in good corporations, building associations included and keep the same invested. It is my will that my said executor and trustee shall pay all taxes and special assessments legally levied upon my property, all expenses of managing my estate, including the lawful commission it is entitled to, and all repairs and improvements on my real estate and all other just charges. The net annual income from my estate not specifically bequeathed, shall be distributed among the following beneficiaries in the proportion here stated, viz. :

"Luella B. Harvey, my sister-in-law, fifteen per cent; Thomas L. Tincher, my brother-in-law, fifteen per cent; John L. Tincher, my wife's nephew, ten per cent; Vermilion County Children's Home, fifteen per cent; St. Elizabeth's Hospital, Danville, Ill., fifteen per cent; Young Women's Christian Ass'n., Danville, Ill., ten per cent; Lake View Hospital, Danville, Ill., ten per cent; Salvation Army, Danville, Ill., five per cent; Vermilion Co. chapter of the Red Cross Association, five per cent.

"Upon the death of Luella B. Harvey, the per cent of the net income given to her shall cease and the same added to my principal estate. The same shall be done with the share given to Thomas L. Tincher and John L. Tincher. Upon the death of the last survivor of the three persons named, Luella B. Harvey, Thomas L. Tincher and John L. Tincher III, the trust herein created shall terminate and my estate shall be finally divided as follows, viz. : To the Vermilion County Children's Home, thirty per cent. To St. Elizabeth's Hospital, Danville, Illinois, twenty per cent. To Lake View Hospital, fifteen per cent. To the Young Women's Christian Association of Danville, Illinois, ten per cent. To the Salvation Army at Danville, Illinois, for use in Danville and Vermilion county, Illinois, only, ten per cent. To the Vermilion county chapter of the Red Cross Association, ten per cent. To Illinois Female College at Jacksonville, Illinois, the remainder. Of course it is intended that

my said executor shall have converted all my real estate into cash or securities before the final distribution. In case they have not done so before the death of the last survivor of the three persons above mentioned they will convert the same as rapidly as possible thereafter.

"Item 28. Before the distribution mentioned in item 27 is made, my said executor will turn over to the trustees of Spring Hill Cemetery at Danville, Illinois, the twenty-five hundred dollars ordered set aside in item 13, hereof, upon said trustees entering into an agreement for the perpetual care of my lots in the cemetery. The usual form of an agreement made by them will be satisfactory.

"Item 29. The principal item of value in my estate, is my one-half interest in the property at the northwest corner of Vermilion and North street, Danville, Ill., known as the Temple. Mr. Platt has always had the chief management of such property. It is my desire that he continue to so manage it, but that he should have five per cent of the gross income for his service. Mr. Platt knows my idea of the value of this property. It is my will that if he or his children wish to purchase my half of said property at any time within two years after this will is admitted to probate, they shall have the right to do so for the sum of one hundred and ninety thousand dollars. They or he shall be given ample time to pay for the same if they so desire time. In case Mr. Platt does not wish to buy my interest and does desire to sell the said property, my said executor is hereby authorized to join with him in the sale and conveyance of such property. Unless the price offered for the whole is more than double the price I have set for my half (if purchased by him) my executor is authorized to buy his interest at such less price so offered. My executor is authorized to borrow money for such purpose and pledge my estate, both real and personal, for the re-payment of any money so borrowed. I am making this provision for a sale to him as a further bequest to my old friend."

It is contended by the appellants that the gift of the residuary estate provided for in items 27, 28 and 29, including the *corpus* of the fund provided for in item 10, to the seven named institutions, violates the rule against perpetuities and is void; that items 13, 19 and 20 violate the rule against perpetuities, and the sums mentioned in them become a part of the residuary estate; and that by item 29 the testator created a new and entirely different scheme of disposition of his estate, by which he has empowered his executor to postpone the payment of the specific legacies in items 1 to 26, inclusive, until payment has been made for the Temple building, should the executor decide to purchase the building, thereby changing the interest of the legatees therein named from vested to contingent, in which event, it is contended, they all violate the rule against perpetuities.

The rule against perpetuities is, that no interest is good unless it must vest, if at all, not later than twenty-one years after some life in being at the creation of the instrument. The possibility that the vesting of the estate may be postponed beyond the period stated by the rule renders the interest void. (*Lawrence* v. *Smith*, 163 Ill. 149; *Eldred* v. *Meek*, 183 id. 26; *Quinlan* v. *Wickman*, 233 id. 39; *Dime Savings and Trust Co.* v. *Watson*, 254 id. 419; *Easton* v. *Hall*, 323 id. 397; Gray's Rule Against Perpetuities, sec. 201.) By item 27 of his will the testator undertakes to dispose of all the residue of his estate, and in so doing devises and bequeaths it to the First National Bank of Danville in trust, to convert the real estate into cash or interest-bearing securities, "whenever the general business conditions of the country make it advisable or desirable to sell such real estate." He mentions the fact that he owns farm lands in Montgomery and Hale counties, Alabama, and Vermilion county, Illinois, aggregating about 2183 acres, and continues: "When conditions appear favorable and a sale can be made of the Alabama lands, it is my judgment my executor should sell such lands on terms part

cash and balance secured by mortgage on land sold, with the option to the purchaser to pay all cash, if he desires. My judgment is said lands should not be sold for several years unless land values become more stable than they are now." The testator further mentions the conditions under which the Montgomery county farm, in Alabama, is being operated, and states that he has livestock and other farm property on the farm, and that his executor should examine into the business as it exists at the testator's death and continue it, if deemed prudent. If not continued, then he directs his executor to sell all his personal property there on the best terms possible and add the proceeds to the principal of the estate. In regard to his other Alabama farm, in Hale county, of 344½ acres, he states that it cost him $17,000 and was acquired by foreclosure of a trust deed; that it is a very good farm, excellent for a dairy, and should bring at least what it cost him, when farming conditions are normal, and that it always brought in some net rent and will pay its way while holding it. Expressions of the will in regard to these two farms do not purport to direct the executor in regard to the time of selling the land more particularly than the direction in the earlier part of the item to convert all the real estate into cash or interest-bearing securities, whenever the general business conditions of the country make it advisable or desirable to sell such real estate. The same may be said of the Newell township farm, in Vermilion county. It is not to be sold so long as the present tenant desires to lease the land and to live on the farm. As to the Collison farm, the executor is directed to join with Harvey, the tenant in common, in any prudent sale he may desire to make, or to hold the same with him so long as he wishes to hold it, and if Harvey desires to purchase the testator's interest, he directs the executor to convey his half interest to Harvey for $30,000—$20,000, the will says, less than it cost the testator. In regard to the family homestead on Vermilion street, the testator ex-

presses his judgment that it has a future, will gain in value as the city grows, and will rent for enough to carry it. Unless a very good sale can be made after his death, he advises holding it to see what Danville will do in the next ten years.

It is argued that under these provisions of the will a violation of the rule against perpetuities may arise; that they embody the fundamental purposes of the creation of the trust, and express the intent of the testator that unless land values become more stable than they were at the time of the execution of the will, an indefinite number of years, in no place limited to the period of time prescribed by the rule against perpetuities, may elapse before the division of the estate and its distribution can be made among the six charitable institutions.

It is further argued by the appellants that the provisions of the twenty-ninth item of the will, by which Platt or his children are authorized to purchase one-half of the Temple building, at any time within two years after the will is admitted to probate, for the sum of $190,000, and in case Platt does not wish to buy the testator's interest and does desire to sell the property, the executor of the will is authorized to join with him in the sale and conveyance of such property, and unless the price offered for the whole is more than double the price the testator set upon his half, the executor was authorized to buy Platt's interest at the best price offered and to borrow money for that purpose and pledge the testator's estate for payment of the money borrowed, gave to Platt or his children an option to purchase the building and ample time to pay for the same if they so desire, and that the period of time in which they are to pay is indefinite and uncertain, so that the power thus given to Platt and his children and the executor to negotiate the sale in question is a power to postpone the day of ultimate division of the money to a time too remote under the rule against perpetuities, since each tract of land and all of

the personal property are to be converted into cash before any division can be made. If Platt or his children do not desire to exercise their right of purchase they may join with the executor and sell and convey the same, and if the price offered at that sale for the whole of the building is not more than $380,000, then the executor is authorized to buy Platt's half interest at such less price offered at the sale, being one-half of the sale price, and the executor is authorized to borrow the money for that purpose and pledge both real and personal property of the estate for the money so borrowed. It is argued that this phrase, "pledge my estate both real and personal for the re-payment of any money so borrowed," means the real and personal property constituting the whole of the estate, and if it does, that all of the specific legacies enumerated in items 3 to 26, inclusive, are postponed until after the building in question is paid for and until the time of final distribution of the money, in which event they would become contingent gifts instead of vested. The appellants contend that where the ultimate devotion of the fund to the charitable institutions must await the termination of a prior gift, the duration of which violates the rule, and where the interest of the charity is not vested until the end of the period or until the time for division, the rule against perpetuities applies to a gift to a charitable institution as well as to any other gift; that the final conclusion as to the intent of the testator as expressed by the language of the will is, that the executor and trustee may abide his time in making final distribution to the seven named institutions. The appellants further contend that the testator advises that the principal item of value in the estate is the half interest in the property known as the Temple, and the testator makes it possible for the executor and trustee to formulate any scheme whereby the other half of this property may be owned by the estate in case certain options are not exercised by Platt or his children within two years after the will is admitted to probate; that "by

the scheme provided for in the will the testator has marshaled all of his assets to the monumental task of purchasing an undivided half interest in the Temple if certain options concerning the same have not been previously exercised. To this end he has the power, if necessary, to withhold the payment of special legacies and life annuities. This scheme of purchasing the undivided half of the Temple is so connected with other gifts that each and all of the provisions of the will are interdependent, and the intention of the testator would be defeated if any portion of the will is held invalid."

A vested interest is not subject to the rule against perpetuities, which is directed only against remoteness in the creation of future interests and an estate which vests within the time limited by the rule is good though it continues beyond that time. (*Easton* v. *Hall, supra.*) An interest which begins within lives in being and twenty-one years thereafter, although it may end beyond then, does not come within the rule. *Armstrong* v. *Barber*, 239 Ill. 389.

The final disposition of the residue of the testator's estate is made by the direction of item 27 of his will that upon the death of the last survivor of the three persons named in that item to whom parts of the income should be paid, his estate should be finally divided, in the proportions named, among the seven charitable organizations mentioned in that item, for that purpose. It is argued that these bequests were not vested but were contingent, on the well recognized principle in regard to the vesting of personal legacies that if there is no independent bequest but only a direction to pay at a future time or upon the happening of a future event, the vesting will be postponed until the event has occurred or the time arrived. This general rule, however, is subject to an exception so well established and universally recognized as to practically constitute another general rule, which is, though a gift arises wholly out of directions to pay or distribute in the future,

yet if such payment or distribution is not deferred for reasons personal to the legatee but merely because the testator desires to appropriate the subject matter of the legacy to the use of another during his life, the vesting of the gift in remainder will not be postponed but it will vest 'at once, only the right of enjoyment being deferred. (*Harvard College* v. *Balch,* 171 Ill. 275; *Knight* v. *Pottgieser,* 176 id. 368; *Pearson* v. *Hanson,* 230 id. 610; *Carter* v. *Carler,* 234 id. 507; *Armstrong* v. *Barber, supra; Mettler* v. *Warner,* 243 Ill. 600; *McComb* v. *Morford,* 283 id. 584; *People* v. *Allen,* 313 id. 156.) The plan of the testator for the disposition of his estate is plain and easily understood. He intended that the whole of his estate should finally be applied to charitable purposes through the instrumentality of the seven charitable organizations which he named as residuary legatees of the *corpus* of the estate, except such comparatively small amounts as he desired to distribute among personal friends, relatives of his deceased wife and others, and other minor purposes, all of which he included in the items of his will 3 to 26, both inclusive; and except, also, that he desired the three relatives of his deceased wife mentioned in item 27 of his will to receive forty per cent of the income of his estate in stated proportions, the share of each to cease upon his or her death and be added to the residue of the estate. The other sixty per cent of the income was to go to six charities, which were named, until the death of the last survivor of the three relatives of the testator's wife, and upon that event the whole *corpus* of the estate was to be distributed to the seven institutions named, in the proportions stated. These institutions were all existing corporations capable of taking at the time of the testator's death and at all times thereafter upon the termination of the preceding interests of the three persons, to permit whose use of a part of the income the enjoyment in possession by the final residuary legatees of the *corpus* of the estate was postponed. There was no uncertainty as

to those who should take the residue—the seven corporations mentioned by name. They were ascertained and had a present capacity to take it at the death of the testator if the estate of the individuals and corporations who were to receive the net annual income had not intervened, and at any time when the death of the last survivor of the three persons named as beneficiaries of the net annual income should terminate the previous estate. Whenever the person who is to succeed to the estate in remainder is in existence and is ascertained, and the event which by express limitation will terminate the precedent estate is certain to happen, the remainder is vested. (*Hoblit* v. *Howser,* 338 Ill. 328.) The estate of these seven corporations was therefore vested at the testator's death. *Carter* v. *Carter, supra; Calvert* v. *Calvert,* 297 Ill. 22; *People* v. *Allen, supra.*

Item 27 of the will contains much language of the testator expressive of his judgment in regard to the condition and value of the property, the manner of its acquisition and subsequent operation and its future prospects. That item contains the following: The executor to "convert my real estate into cash or interest-bearing securities whenever the general business conditions of the country make it advisable or desirable to sell such real estate." "When conditions appear favorable and a sale can be made of the Alabama lands, it is my judgment my executor should sell such lands. * * * My judgment is said lands should not be sold for several years unless land values become more stable than they are now." "I deem it prudent to retain this farm indefinitely. [Referring to the farm in Newell township, Vermilion county, Illinois.] It is good property. Mr. Miller is a good farmer and honest man and a worthy citizen." The language in regard to the Hale county, Alabama, land is: "It is a very good farm—excellent for a dairy and should bring at least what it cost me when farming conditions are normal. It has always brought in some net rent and will pay its way while holding it." "My judg-

ment is this property [referring to the family homestead on Vermilion street, Danville,] has a future and will gain in value as the city grows. It will rent for enough to carry it. Unless a very good sale can be made after my death, I advise holding this corner to see what Danville will do in the next ten years." This language is not testamentary. It does not direct the taking of any action by the executor or any disposition of the property concerned. It is merely advisory and expressive of the judgment of the testator at the time the will was executed, eighteen months before his death. It is not expressive of a wish or request or desire, much less of an intention to direct or command any action of the executor. "The words 'will,' 'wish,' 'request,' 'hope,' 'desire,' 'trust,' 'have confidence,' 'recommend,' 'not doubting,' and other similar words found so often in wills, express a state of mind in the testator, and they generally operate as a direct gift, devise or bequest; but they are frequently so used that it is doubtful whether they are absolute directions or mere suggestions, to be acted on or not, according to the discretion of the donee. The point really to be determined in all these cases is whether, looking at the whole context of the will, the testator intended to impose an obligation on his legatee to carry his wishes into effect, or whether, having expressed his wishes, he intended to leave it to the legatee to act on them or not, at his discretion." (1 Perry on Trusts, sec. 114.) The language which has been quoted uses none of these words or any other indicating an intention to control the discretion of the trustee, and they cannot be held to limit the discretion of the executor in carrying out the intention expressed in the will. The difference between the language of the testator when he merely expresses his judgment or advice in the one case, and where he expresses his will or intention in the other, is illustrated by his language in regard to Miller and the Newell township farm: "I deem it prudent to retain this farm indefinitely. It is good property. Mr.

Miller is a good farmer and honest man and a worthy citizen. It is my *will* that he be permitted to lease the land as long as he desires to lease it and the same *shall* not be sold so long as he desires to live on the farm." Again, in regard to the Collison farm, at Collison, Illinois, the testator says: "My executor *will* join with Mr. Harvey in any prudent sale he may desire to make or hold the same with him so long as he wishes to hold it. * * * If Mr. Harvey desires to purchase my interest I direct my executor to convey my one-half interest to him for thirty thousand dollars."

The appellants contend that under the twenty-ninth item of the will an option is given to Platt or his children to purchase the testator's half interest in the property known as the Temple, (which he states is the principal item of value in his estate,) at any time within two years after the will is admitted to probate, for $190,000, and that they shall be given ample time to pay for it, if they desire time, and in case Platt does not wish to buy the testator's interest and does desire to sell the property, the executor is authorized to join with him in the sale. Unless the price offered for the whole is more than double the price set for the testator's half if purchased by Platt, the executor is authorized to buy his half at the less price offered and to borrow money for the purpose and pledge the testator's estate for the money borrowed. It is claimed, first, that this option constitutes a violation of the rule against perpetuities because of the possibility that the exercise of the option may happen at a time beyond that prescribed by the rule against perpetuities, for the reason that there is no time certain when the will may be admitted to probate. The appellants rely upon the case of *Johnson* v. *Preston,* 226 Ill. 447, to sustain this objection. There was a devise of land in that case "to have and to hold for the space of twenty-five years from and after the date of the probate of this will." It was clear from the language of the will that whatever interest in the land the executor took under it could not vest in him

until the probate of the will, and while this event would in the usual and ordinary course of events probably occur within a few months, or, at most, a few years, after the death of the testatrix, yet it could not be said that it was a condition which must inevitably happen within twenty-one years from her death, and since a bare possibility that it might not happen within the prescribed limits was all that was necessary to bring the devise in conflict with the rule, it was held that the devise to the executor was in conflict with the rule and was therefore void. In *Armstrong* v. *Barber, supra,* it was contended that the title of the executors violated the rule against perpetuities for the same reason as the title in the *Johnson case,* but the case was distinguished on the ground that the estate of the trustees in the *Armstrong case* was created by the words "give, devise and bequeath" to the trustees "all of my property." In various clauses of the will different sums of money were directed to be set apart, held, managed, controlled and invested by the trustees for various purposes and for various periods of time, computing from the date of the probate of the will and continuing for five years or ten years or other period from the date of the probate of the will, and then to be paid to certain beneficiaries. The devise to the trustees was held valid, as it was an immediate devise of all the testator's property. There was nothing in the will to indicate that the gift was not to take effect in the trustees until ten years after probate. The estate in the trustees vested in interest and possession at the death of the testator, and therefore the rule in the *Johnson case* had no application. The probate or letters testamentary, when granted, relate back to the date of the testator's death and validate acts done by an executor before his appointment. The probate merely furnishes the means of establishing by record evidence the validity of an existing right. So, also, it was held in *Mettler* v. *Warner, supra.*

The devise to the trustee was an immediate devise in trust of a vested title, and the devise of the equitable estate to the beneficiaries of the trust was also of a vested equitable title, as we have seen. Both titles vested at the death of the testator, regardless of the date of the probate of his will.

The estates are all vested—the legal estate in the trustee, the First National Bank of Danville, and the equitable estate, first, in the persons and corporations named among whom the net income is to be distributed, the share of each of the three individual beneficiaries upon his or her death to become a part of the residuum of the estate, and second, in the seven charitable organizations named in item 27 of the will, among which the estate is directed to be finally divided. It is contended that the provisions of item 29 create an entirely new scheme for the disposition of the residue of the estate inconsistent with that provided by item 27, which makes the provisions of item 27 contingent and is clearly offensive to the rule against perpetuities. This claim is founded upon Platt's right to purchase one-half of the Temple for $190,000 at any time within two years after the probate of the will, which extends to his children also who may have been born after the testator's death, and, upon the authority given to the executor in case Platt or his children do not exercise the right, to purchase Platt's interest and borrow money for that purpose and pledge the estate for the re-payment of the borrowed money. It is argued that the limit of time within which the election of Platt or his children to purchase may be made could possibly extend beyond twenty-one years after the death of the last individual beneficiary under item 27, that no limit is set to the time in which the money borrowed by the executor to make the purchase must be re-paid, and that in case the executor elects to purchase and the venture fails, the entire estate may be lost. These contentions ignore the provision in item 27 in which the testator declares his ex-

press intention that his executor "shall have converted all my real estate into cash or securities before the final distribution. In case they have not done so before the death of the last survivor of the three persons above mentioned they will convert the same as rapidly as possible thereafter." This will must be construed in accordance with the rule of construction that all the parts of a written instrument must be considered together; no clause or phrase can be construed by itself but all must be considered in relation to every part and to the instrument as a whole. Item 27 of the will clearly expresses the intention of the testator that his executor shall convert all his real estate into cash or securities before the death of the three individual beneficiaries of the trust. Item 29 must be construed in connection with this clause and is limited by it. The option given to Platt and his children is thus controlled so that it must be exercised not only within two years after the probate of the will but also in the lifetime of the three individual beneficiaries in item 27. The provisions of item 29, except the option to Platt and his children, are of the same character as those of item 27, are expressions of judgment, suggestions in regard to management, control or disposition of the property, not imperative in their character but advisory, only, and all controlled by the provision of item 27 requiring the real estate to be converted into cash or securities before final distribution to be made upon the death of the survivor of the three persons named in item 27. Whether the real estate had been converted into cash or securities or not, the estate of the seven charitable institutions was an equitable vested interest, which they could proceed at once to enforce by a bill requiring the trustee to carry out the trust by a sale of the property, without reference to the provision of the will requiring this to be done as rapidly as possible.

No objection is made to item 10 of the will, except that the principal sum of $12,000 is directed to become a part of the residuary estate after the death of Frank E. Neal. This

objection depends upon the validity of the objection to the final disposition of the estate as provided in item 27, and therefore falls with the objection to that provision.

Items 13 and 28 are objected to as being in violation of the rule against perpetuities. Item 13 directs the executor to maintain a fund of $2500 and from the income from such fund keep the testator's lots in Spring Hill Cemetery in good condition. This does not provide for perpetual maintenance, because it is further provided in item 28 that before the distribution mentioned in item 27 is made, the executor will turn over to the trustees of Spring Hill Cemetery, at Danville, Illinois, the $2500 ordered set aside in item 13, upon said trustees entering into an agreement for the perpetual care of the cemetery lots in question, in the usual form of such agreement made by them. It is provided by an act amendatory of the act of April 21, 1899, in relation to the conveyance, use and preservation of burial lots in cemeteries, that every company or association incorporated for cemetery purposes under any general or special law of this State may receive, by gift, devise, bequest or otherwise, moneys or real or personal property, or the income or avails of such moneys or property, in trust, in perpetuity, for the perpetual and permanent improvement, maintenance, ornamentation, repair, care and preservation of any burial lot or grave, vault, tomb or other such structures in any cemetery owned or controlled by such cemetery company or association, upon such terms and in such manner as may be provided by the terms of such gift, devise, bequest or other conveyance of such moneys or property in trust and assented to by such company or association, and every such company or association owning or controlling any such cemetery may make contracts with the owner or owners or legal representatives of any lot, grave, vault, tomb or other such structure in such cemetery, for the perpetual and permanent improvement, maintenance, ornamentation, care, preservation and repair of any such

lot, grave, vault, tomb or other such structure in such cemetery owned or controlled by such cemetery company or association. Laws of 1911, p. 122; Cahill's Stat. 1931, chap. 21, par. 38, p. 232; Smith's Stat. 1931, chap. 21, par. 32, p. 249.

The appellants' objection to the provisions of items 19 and 20 of the will is that they are not gifts to charity. The comprehensive legal definition of a charity or charitable use is contained in the opinion by Gray, J., in *Jackson* v. *Phillips,* 14 Allen, 556, which was approved in 2 Perry on Trusts, sec. 697. It is: "A charity, in a legal sense, may be more fully defined as a gift, to be applied, consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works, or otherwise lessening the burthens of government. It is immaterial whether the purpose is called charitable in the gift itself if it is so described as to show that it is charitable in its nature." This definition has also been approved by our decisions in *Crerar* v. *Williams,* 145 Ill..625, *Morgan* v. *National Trust Bank,* 331 id. 182, and *Summers* v. *Chicago Title and Trust Co.* 335 id. 564. The gifts in the two items in question come clearly within this definition. The interest arising from the fund provided for in item 19 tends to the advancement of learning by encouraging the efforts of pupils year by year to attain such standing in the high school as to achieve the prize. It is equally true of the fund provided for in item 20 that it tends to the advancement and improvement of the boys and girls in an industry important to the welfare of society, by stimulating interest through competition.

The decree of the circuit court is affirmed.

*Decree affirmed.*