19 Cal.App.3d 859 (1971)
97 Cal. Rptr. 46
Estate of RUBY-ETHEL LAMB, Deceased.
MABEL LAMB PAULSEN et al., Claimants and Appellants,
v.
SAN FRANCISCO FOUNDATION OF OTOLOGY et al., Claimants and Respondents.
Docket No. 28825.
Court of Appeals of California, First District, Division Four.
September 3, 1971.
*861 COUNSEL
Dillon & Cavanaugh and Francis B. Dillon for Claimants and Appellants.
Morrison, Foerster, Holloway, Clinton & Clark, Richard Archer, Stanley A. Doten, John L. Boudett, Evelle J. Younger, Attorney General, Carl Boronkay and Joanne Condas, Deputy Attorneys General, for Claimants and Respondents.
*862 OPINION
DEVINE, P.J.
On this appeal from a "Decision and Judgment Determining Interest in Estate" which was made pursuant to the executrix' petition to determine heirship, we are presented with the question whether a devise and bequest to The San Francisco Foundation of Otology (hereinafter The Foundation), a charitable corporation which was not in existence at the time of the execution of the will or at the time of the death of the testatrix, may be sustained.
The Will: Ruby-Ethel Lamb executed the witnessed will on March 7, 1967. She died on December 24, 1968, and the will was admitted to probate on February 6, 1969. In the will she declared that she had never been married and that she had no adopted children; that her nearest relatives were Alice Grace Lamb, a sister who made her home with the testatrix; Frances Lamb Atthowe, a sister; Mabel Lamb Paulsen, a sister; George Thomas Lamb, a brother; and one niece and one nephew, unnamed but described as the issue of a deceased brother and as residing in Australia. The testatrix declares that she makes no provision for the niece and nephew.
The entire estate was left to Alice Grace Lamb, but because this sister predeceased the testatrix, disposition of the estate is to be made in accordance with the paragraph which was made in the light of this possible event. There was bequeathed to each of the two sisters and to the brother who were living at the time of the execution of the will the sum of $5,000. If one should die, that person's share was to be divided among the others, but if only one were to survive, the sum of $15,000 was to go to the survivor. When the testatrix died, only one, Mabel Lamb Paulsen, did survive. The residuary clause devises and bequeaths all of the remainder of testatrix' property to The San Francisco Foundation of Otology.
Extrinsic Evidence: The articles of incorporation of The San Francisco Foundation of Otology were filed with the Secretary of State on April 29, 1969, about four months after Miss Lamb's death. Within a few months the Department of Justice of the State of California and the United States Treasury Department recognized exemption of The Foundation as a charitable institution.
The President of The Foundation at the time of the hearing of the petition to determine heirship was Dr. Francis A. Sooy, professor of otolaryngology at the University of California in San Francisco, and chairman of the department of otolaryngology. He testified that it was his purpose, if there were concurrence by "the other director," to point The Foundation's *863 activities toward the training of young otologists and to provide "seed money" for research projects which are not advanced far enough to qualify for sophisticated funds.
Miss Lamb, the testatrix, came to Dr. Sooy in 1962, because she suffered from severe hearing loss. It was caused by otosclerosis, a hereditary progressive affliction which affects the middle ear. Her hearing loss was about 80 percent in her left ear and 50 percent in her right ear. A then new surgical procedure was employed, stapedectomy, the removal of the stapes bone of her left ear. Following the success of this operation, surgery was done on the right ear in December 1963. Eventually, Miss Lamb had a hearing improvement to a loss between 30 and 35 percent, which in the medical profession is regarded as useful or functional hearing. Following each of the operations, Miss Lamb wrote to Dr. Sooy expressing her gratitude fervently and suggesting the desirability of the giving of assistance to his work.[1]
Dr. Sooy testified that a number of people had indicated they would like to leave money toward research or teaching in the area of otology, but because of student unrest they did not want to leave money to the university. Dr. Sooy thought that a foundation might be the recipient of such funds. There was a foundation of otology in Los Angeles. Dr. Sooy had asked a doctor in that city to send him a copy of its articles in 1961. In 1964 there was a conversation between Miss Lamb and Dr. Sooy, although *864 it was not initiated by him. He did not say that he was contemplating a foundation of otology in San Francisco; he simply said that he hoped to set up a charitable foundation to carry on some of the work he was then doing but did not give it a name. He told Miss Lamb that the foundation was to foster training and research in otology. Miss Lamb said it might be possible for her, at some future date, to contribute something toward the work and she was particularly impressed by the fact that a "foreign fellow" from Indonesia had been working with Dr. Sooy.
In 1967, at a date before the execution of the will, Miss Lamb handed to her attorney, Mr. Hubert W. Bryant, who later drafted the will, a slip of paper which had been given to her by Dr. Sooy's secretary and which contained the name, "The San Francisco Foundation of Otology."
The Controversy: The inventory value of the estate is $158,672.10. In the proceedings to determine heirship, Mabel Lamb Paulsen, the surviving sister of the testatrix, and William John Lamb and Edna Lamb, the nephew and niece in Australia, sought distribution of the residue as heirs, contending that the bequest to The Foundation failed and that Ruby-Ethel Lamb died intestate as to such residue. Claim to the entire residue was made by The San Francisco Foundation of Otology and by the Attorney General acting in his capacity as enforcement officer of charitable trusts, who stated that a suitable vehicle for carrying out the charitable intent of the testatrix is The San Francisco Foundation of Otology. The trial judge decided in favor of respondent on two grounds: first, that no provision of California law invalidates the bequest although the articles of incorporation were not signed or filed prior to the death of the decedent, and second, as an alternative conclusion, that by reason of the general charitable intention of decedent, as found according to the evidence and under California law applicable to trusts, the bequest should be distributed to respondent.
(1) Ability of Respondent to Take Other Than by Application of Cy Pres: We conclude that except for the doctrine of cy pres, respondent would not be competent to receive the testamentary disposition and that, therefore, the first ground of the ruling is not sustainable. The fact that no provision of California law invalidates such a disposition does not support the proposition that a corporation which has come into being after the decedent's death and which, therefore, is a nonentity at the time of death, may take under the laws relating to wills. Probate Code section 27 describes who may take testamentary disposition and although this includes corporations and unincorporated religious, benevolent or fraternal associations, the section does not extend to entities created later. (2) A will speaks as of the time of the testator's death (Estate of Berger, 198 Cal. 103 [243 P. *865 862]), and title to property passing by will vests in the legatee at that moment (Estate of Kalt, 16 Cal.2d 807 [108 P.2d 401, 133 A.L.R. 1424]). (3) It is true that a valid charitable gift can be made to a corporation which the testator directs to be formed after his death. (4 Scott on Trusts, Charitable Trusts, § 401.8, pp. 2881-2882, § 348.3, pp. 2566-2567; Inglis v. Trustees of the Sailor's Snug Harbour, 28 U.S. (3 Pet.) 99, 117 [7 L.Ed. 617, 624].) Until the corporation is formed, equity will not suffer a failure to occur by lack of a trustee but will supply whatever is necessary. (Estate of McKenzie, 227 Cal. App.2d 167, 172 [38 Cal. Rptr. 496, 7 A.L.R.3d 1275]; Estate of DeMars, 20 Cal. App.2d 514 [67 P.2d 374]; Fay v. Howe, 136 Cal. 599 [69 P. 423]; Estate of Upham, 127 Cal. 90 [59 P. 315].)
But this is quite different from sustaining, apart from the powerful and beneficent provisions of cy pres, the proposition that a testamentary disposition to a nonentity which the testator or testatrix believes to be in existence at the time of making of the will or to become existent at least before the time of death. (4a) It is apparent that Miss Lamb, the testatrix in this case, believed that The San Francisco Foundation of Otology existed as a nonprofit corporation when she made her will.
Cy Pres: There is not in this state, so far as we know, any case in which the doctrine of cy pres has been used to effectuate a testamentary disposition to a corporation which was not in existence at the time of the death of the testator. In Estate of Upham, 127 Cal. 90, 95-96 [59 P. 315], the court speaks approvingly of a few cases from other jurisdictions in which charitable legacies to institutions neither established nor incorporated during the life of the donor were sustained. But in the Upham case itself, the object of the trust, an orphan's home, was in existence at the time of the decedent's death and had been for many years. The technical difficulty which was overcome by application of cy pres had to do with the competency of the trustees to receive a devise. Thus, the most we have directly on the subject in this state is dictum. But we do have principles established by decisions of California courts which we can reason to a conclusion, and we do have authorities in the form of recognized texts and of decisions from other states.
(5) We start with the principle that gifts to charity are highly favored and will be liberally construed to uphold their validity whenever possible. (Estate of Upham, supra, 127 Cal. 90; Estate of Tarrant, 38 Cal.2d 42, 47 [237 P.2d 505, 28 A.L.R.2d 419]; Estate of Bunn, 33 Cal.2d 897, 903 [206 P.2d 635]; Estate of Hughes, 202 Cal. App.2d 12, 17 [20 Cal. Rptr. 475]; Estate of Loring, 29 Cal.2d 423, 435 [175 P.2d 524].)
(6) Although the doctrine of cy pres ordinarily applies when there is a formal trust which in some respect is doubtfully identified, the doctrine is *866 applicable where, as in the case before us, no trust is mentioned in the will. In a sense a charity always receives the gift in trust for its purposes. (In re Bletsch's Estate, 25 Wis.2d 40 [130 N.W.2d 275, 278].)
(7) Turning from these preliminary considerations, we proceed to state the rule as it is generally expressed, and as we hold should be taken as the law of this state, in situations where the donee comes into legal existence at a time later than that of the testator's death. In Restatement Second Trusts, Charitable Trusts, section 399, page 305, there is this statement of the principle: "Gift to corporation or association. If a testator devises or bequeaths property to a charitable corporation or association which refuses to accept the devise or legacy, or which is incapable of taking or holding it, or which is not in existence, the disposition will not fail if the testator manifested an intention to devote the property to charitable purposes and not merely to make a gift to the particular corporation or association." (To the same effect, 4 Scott on Trusts (2d ed.) § 397.3, pp. 2793-2795; Bogert, Trusts and Trustees (2d ed.) § 440, pp. 461-466.)
It will be seen from the above that there are two essentials of application of cy pres where the donee of a charitable gift ceased to exist (the more frequent occurrence) or did not yet exist at the date of the death of the decedent. The first is that the gift must be truly a charitable one, that is, it must be intended to benefit either the whole community or a class indefinite as to members and individuals (People v. Cogswell, 113 Cal. 129, 138 [45 P. 270]); and the second, that the dominant intent of the donor must be that of carrying out a charitable purpose, the particular instrument for doing this being secondary.
(4b) Appellants submit that it is impossible to ascertain the intent, charitable or otherwise, of the decedent because she had no reason to know what the general purposes of The Foundation were to be since its very existence had never been discussed by her with Dr. Sooy. But we know from Miss Lamb's letters and from the conversation with Dr. Sooy, in which he referred to a prospective charitable foundation to carry on the work of training and research in otology, and from her reply that she might be able to contribute toward the work, that she did desire to provide for persons unknown to her relief from the kind of affliction which had beset her and from which she had been in large measure delivered by a physician's skill in the field of otology. The very name "otology" which was used in the will surely was appreciated by her, not only because it appears from her letters that she was a literate and refined person, but also because of her conversation with the doctor. The first requirement of cy pres is satisfied. In Estate of McKenzie, 227 Cal. App.2d 167, 169-172 [38 Cal. Rptr. 496, 7 A.L.R. 3d 1275], a trust was held to be charitable which was "`to be formed payable *867 as a reward to the person who decides the cause of Rhomatoid [sic] Arthritis and a cure for the same to the satisfaction of the Medical Board of the University of Calif. at L.A.'" (id., at p. 168); and in Estate of Cafferty, 246 Cal. App.2d 711 [55 Cal. Rptr. 173], a charitable trust was held to have been established by the simple words "help for the blind."
The question which we must answer as to the second condition for applying cy pres is whether, on the one hand, the dominant purpose of the testatrix was to benefit a particular institution in its charitable work or, on the other hand, to have the charitable work done even if the particular institution were incapable, at least at the time of death, to perform the work. We conclude that the latter was the dominant purpose of the testatrix. The very fact that she did not know anything about the organization of the foundation, its officers, its trustees, its articles of incorporation, for these were not in existence, shows a lack of concern for the particular institution. Indeed, the "nonexistence cases" more readily fit the second condition for cy pres than do many others. In other cases, we see frequently the situation where the testator has been associated with a church, a benevolent association or a college which has gone out of existence. The evidence in such cases readily may show that the dominant purpose of the donor was to benefit the particular institution. To be sure, Miss Lamb reposed great confidence in Dr. Sooy. She was willing to take the simple slip of paper giving the name of the institution as sufficient for her will. But she must have understood that some sort of organization, and not Dr. Sooy alone, would carry on her desired work. There is a proper balance between benevolence towards charitable work in the field of one form of human affliction and limitation to an effectuating agency to move a court of equity to do what the testatrix undoubtedly wished to be done.
The absence of a gift over is a factor which supports application of cy pres. (Miller v. Mercantile-Safe Deposit and Trust Co., 224 Md. 380 [168 A.2d 184, 189]; Town of Brookline v. Barnes, 324 Mass. 632 [87 N.E.2d 843]; Ball v. Hall (Vt.) 274 A.2d 516, 522.) The testator's intent that the gift shall be used for charitable purposes is thus shown to be exceptionally firm. The donor entertains no doubt of the efficacy of the donation. He does not choose to designate an alternate beneficiary. Thus, in the present case, the testatrix left everything to the sister who lived with her but she provided for the contingency of this sister's death and thereafter provided for the contingencies of the death of others. These provisions became effective. Mabel Lamb Paulsen received $15,000 by reason of the death of the sister who was to have been the sole legatee and also by reason of the deaths of a brother and a sister. To this extent and no farther did the testatrix choose to provide for her relatives. In fact, she expressly excluded the niece and *868 nephew, living afar, who would participate if we were to declare intestacy as to the residue.
The presence in the will of the in terrorem clause is additional evidence of an intent that the charitable disposition be carried into effect. (4 Scott on Trusts (2d ed.) § 399.2, pp. 2833-2834; Miller v. Mercantile-Safe Deposit and Trust Co., supra, 168 A.2d at p. 190.) There is such a clause in the Lamb will. (Respondent expressly disclaimed desire to invoke the clause against Mrs. Paulsen and the court did not apply it.)
Appellants place considerable reliance on a declaration in Estate of Black, 211 Cal. App.2d 75, 91 [27 Cal. Rptr. 418], that "there is a reluctance by the courts to apply the cy pres doctrine where a gift fails ab initio." But Estate of Black and Estate of Zilke, 115 Cal. App. 63 [1 P.2d 475], also cited by appellants, are cases in which it was difficult to determine which particular institution was in the testator's mind. In Estate of Black, a donation was "To The University of Southern California known as The U.C.L.A." (to alumni, ambiguity approaching antithesis), wherefore the Court of Appeal simply sent the case back for the taking of extrinsic evidence which had been refused by the trial court. In Estate of Zilke, the bequest was to "Offens home of San Francisco." There were seven orphans homes in that city. No evidence other than the will had been offered, wherefore the appellate court found it impossible to ascertain the testator's intent from the will itself. In the case before us, there was ample extrinsic evidence to show the intent of the testatrix.
The judgment is affirmed.
Rattigan, J., and Christian, J., concurred.
NOTES
[1] "Nov. 8th 1962
 "My dear Dr. Sooy

"This operation is one of the happiest things that has happened to me. Life seems swinging along to music! I can hear the telephone and can answer it on my own power  Of course some voices are better than others. I even come to breakfast and forget to put on the hearing aid  In talking directly to a person I must be rather close and their voice distinct. But it is almost incredible to know that I do hear again.
"To you I feel a gratitude impossible to express  Your wonderful talents so skilled and so wisely disciplined are graciously used for the comfort and happiness of others.
 "Sincerely 
 "I thank you
 "Ruby-Ethel Lamb"
 "January 4th 1964
 "My dear Dr. Sooy
"It is hard to adequately thank anyone for an elegant as well as a very precious gift.
"But if the two small words `thank you', could carry sufficient meaning to you, you would understand the great appreciation and abounding joy I feel in the results of your kindliness and your skill,  skill that is the outcome of vision, patience, and long study and devotion to your profession.
"The Chinese have a proverb  `Place your values where time is on your side.'
"I hope that the time will come when one of your grateful patients may help this proverb to come true for the wonderful work you are directing.
 "Thank you
 "Ruby-Ethel Lamb"