UNITED STATES of America, on Behalf
of the UNITED STATES COAST
GUARD, Plaintiff,

v.

Daniel A. CERIO, as Executor of the
Estate of Robert T. Alexander, et
al., Defendants.

Civ. A. No. 93–42–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Aug. 31, 1993.

J. Christopher Kohn, Robert M. Hollis, James J. Faughnan, Attorneys, Civil Div., Commercial Litigation Branch, U.S. Dept. of Justice, Andrew S. Pessin, General Law Div., Office of the Chief Counsel, U.S. Coast Guard, Washington, DC, Richard Parker, Asst. U.S. Atty., Alexandria, VA, for plaintiff.

Fred C. Alexander, Jr., McGuire, Woods, Battle & Boothe, Alexandria, VA, for defendants.

### MEMORANDUM OPINION

ELLIS, District Judge.

#### I.

This is a rare case. How often, after all, does the recipient of a generous bequest object to that bequest and threaten to reject it on the ground that it is too generous? Yet that is precisely what has occurred here. Indeed, this is essentially a case of looking the gift horse in the mouth and finding it too good to accept as is.

More particularly, this unique dispute concerns the validity and disposition of a retired Coast Guard Captain's testamentary gift to the United States Coast Guard Academy (the "Academy") for the purpose of establishing a trust fund, the annual income of which is to be awarded each year to the graduating cadet who attains the highest grade point average in chemistry and physics while enrolled at the Academy. So large is the gift—the trust corpus is estimated to be worth over $1 million—that the proposed cadet award would range from $65,000 to $130,000 annually. Such an annual cadet award, according to the Coast Guard, would seriously disrupt

the Academy's operations and interfere with the attainment of its goals. Unless the trust is somehow modified, the Coast Guard claims it would be compelled to refuse the gift. Seeking to avoid this result, the United States brought this action on behalf of the Coast Guard seeking application of the equitable doctrine of *cy pres* to change the terms of the trust so that the Coast Guard Academy can accept the testamentary trust in a modified form. Not surprisingly, the testator's heirs-at-law, the defendants here, argue that the trust should either be performed as written or held to fail, in which event, the trust funds would pass to them under Virginia's intestate succession laws.

This matter came before the Court for trial on the merits on August 4, 1993. A total of seven witnesses presented live testimony, seven on behalf of the Coast Guard and two on behalf of the heirs. A tenth witness appeared by deposition. In addition to testimony, numerous documents were admitted into the record as evidence, including Captain Alexander's complete service record. Pursuant to Rule 52(a), Fed.R.Civ.P., the Court sets forth here its findings of fact and conclusions of law. For the reasons that follow, the Court concludes first that the terms of the trust are subject to alteration under the doctrine of *cy pres;* and second, that the alteration of those terms, as set forth here, satisfies the doctrine as it is both faithful to the testator's purposes and consistent with the Academy's goals.

#### II.

#### FINDINGS OF FACT

Robert T. Alexander, a resident of the Commonwealth of Virginia, died testate on April 18, 1988. A retired Coast Guard Captain, Alexander had spent his entire thirty-four year professional career with the Coast Guard. He began his career with the Coast Guard as a cadet at the Academy in 1928, following in the footsteps of his half-brother, George C. Alexander, who graduated from the Academy in 1904. Captain Alexander graduated second in his Academy class, received a Bachelor of Science Degree in Engineering, and went on to become a successful

Coast Guard officer. By the time he retired from the Coast Guard in 1962, Captain Alexander had risen to the rank of Captain.[1] During his Coast Guard career, Captain Alexander also earned a Master of Science degree in Physics from the University of Michigan in 1940, and a second Bachelor of Science degree in Engineering from the George Washington University in 1953.

Captain Alexander's assignments as a Coast Guard officer during his thirty-four year career often required application of his engineering and scientific skills. Three years after his graduation, Captain Alexander formally requested assignment to the Academy as an instructor. This request was granted, and, in 1935, he was assigned to the Academy as an instructor in chemistry and physics. Captain Alexander remained as an instructor at the Academy for five years. During this period, he also served as Head of the Chemistry Department. In addition to his tour of duty as an Academy instructor, Captain Alexander served in many other billets requiring scientific and engineering expertise including, *inter alia*, his tenure as: (1) Chief of Staff, 12th Coast Guard District, from 1961 to 1962; (2) Chief, Civil Engineering Division, from 1954 to 1958; and (3) Chief, Testing and Development Division, from 1947 to 1952. He also maintained memberships in the American Society of Civil Engineers, the Society of Naval Engineers, and the American Society of Military Engineers.

Captain Alexander distinguished himself as a Coast Guard officer, receiving numerous commendations and awards, including, *inter alia:* (1) the Bronze Star Medal, awarded in the name of the President of the United States, for "distinguishing himself by meritorious conduct as a Commanding Officer of a U.S. Navy vessel during operations against enemy-held islands in the Southwest Pacific Area . . . ;" (2) the American Defense Service Medal; (3) the American Campaign Medal; (4) the Asiatic–Pacific Campaign Medal; (5) the European–African–Middle Eastern Campaign Medal; (6) the World War II Victory Medal; and (7) the National Defense Service Medal. In 1962, a disability forced Captain Alexander to retire from the Coast Guard. But following his retirement, and up until the time of his death in April 1988, Captain Alexander maintained a close attachment to the Coast Guard, faithfully attending Coast Guard functions on virtually a monthly basis. Although the exact number of Coast Guard functions attended by Captain Alexander is unknown, his close friend and fellow Coast Guard officer, Admiral Cowart, estimated that they attended approximately 6–8 functions each year together.[2]

Although Captain Alexander enjoyed a distinguished career in the Coast Guard, he was not selected for flag rank. The heirs rely chiefly on this event in their attempt to paint a picture of Captain Alexander as a man embittered against the Coast Guard for failure to acknowledge his merit. The attempt fails; the testimony paints a different picture. No doubt, Captain Alexander was profoundly disappointed when he was not selected for flag rank. Yet, Admiral Cowart testified convincingly that Captain Alexander shared with him a sincere life-long affection for the Coast Guard. According to the Admiral, Captain Alexander never complained

---

1. Specifically, immediately upon his graduation from the Academy in May 1931, Captain Alexander was commissioned as an Ensign. Thereafter, he received steady promotions and became a Captain in 1948. In July 1962, Captain Alexander was placed on the temporary retirement list because of a physical disability. Approximately five years later, Captain Alexander was placed on the permanent retirement list.

2. The Court would be remiss if it did not recognize with admiration the steadfastness and warmth of Admiral Cowart's nearly life-long friendship with Captain Alexander. Admiral Cowart and his wife were close friends of Captain Alexander and his wife for the many years both served as Coast Guard officers and as instructors at the Academy. And it is apparent that friendship between these men continued to flourish after *Captain Alexander's wife died and during the Captain's declining years, when he was not always in good health.* The record reflects that Admiral Cowart faithfully ensured that Captain Alexander was advised of and attended (with the Admiral) various Coast Guard and professional engineering social functions and meetings. This friendship was based on, among other things, Admiral Cowart's high regard for Captain Alexander's intellect and engineering ability. As Admiral Cowart put it, when he—Captain Alexander—spoke "I listened carefully."

about the Coast Guard; he loved it. Mrs. Mahoney, Captain Alexander's personal secretary and assistant in his final years,[3] noted that all the Captain talked about was his years as a Coast Guard officer. She never heard him say anything negative about the Coast Guard or the Academy. Nor did she ever hear him express any bitterness over the Coast Guard's decision not to promote him to the rank of Admiral. Significantly, she noted that everyone addressed him as "Captain," hardly a title he would have retained had he been irreconcilably bitter.

This general theme was echoed by Mr. Cerio, the Captain's personal lawyer for twenty years, his neighbor for thirty and the executor of his estate.[4] Significantly, Mr. Cerio testified that the Captain spoke highly of the Academy, noting that he felt privileged to have been a cadet there. Similarly, Mr. Cerio reported that Captain Alexander also spoke affectionately and often of the Coast Guard. As Mr. Cerio put it, "that's where his heart was."

At the time of his death in April 1988, Captain Alexander was a widower with no children. He was survived by no relatives of closer kinship than nieces and nephews or perhaps more accurately, half nieces and nephews. Specifically, Captain Alexander was survived by the following potential heirs-at-law:

1. Donald David Alexander, a Michigan resident, who is one of two surviving nephews of Captain Alexander. Donald Alexander's father was Captain Alexander's half-brother.

2. Nelson Earl Alexander, an Ohio resident, who is the other surviving nephew of Captain Alexander. Nelson Alexander is Donald Alexander's brother and, like him, his father was Captain Alexander's half-brother.

3. Julia Ann Farkas, an Ohio resident, who is one of the two surviving nieces of Captain Alexander. Farkas is the sister of Donald and Nelson Alexander.

4. Mary Louise Alexander Brumbaugh, an Ohio resident, who is the other surviving niece of Captain Alexander. She is the sister of Donald and Nelson Alexander and Julia Ann Farkas.

5. Robert Jeffery Alexander, an Ohio resident, who is a grand-nephew of Captain Alexander.

6. Carissa Greenhill, a California resident, who is great-grand-niece of Captain Alexander.

7. Carol Wandersee, an Arizona resident, who is a grand niece of Captain Alexander.

8. Judy Gail Peterson, address unknown, who is a grand niece of Captain Alexander.[5]

With the exception of Donald D. Alexander, none of these heirs had any contact with Captain Alexander during the five years immediately preceding his death. In fact, Captain Alexander does not appear to have been particularly close to any surviving family members. Although it was established at trial that Donald Alexander had infrequent contacts with Captain Alexander, their relationship appears to have been far from intimate. It does appear that Captain Alexander, in his later years, may have sought to renew some family ties, but little seems to have come of this. While Donald D. Alexander and the Captain traded a few visits, gifts and telephone calls, the record as a whole makes unmistakably clear that the Captain

3. Mrs. Mahoney's duties included ensuring the timely payment of the Captain's bills and coordinating the scheduling of and transportation for, his many medical appointments. She noted that his final five years were not without significant physical hardship. The Captain was hard of hearing and, as a result of throat cancer surgery, he subsisted entirely on a liquid diet and had great difficulty speaking clearly. Given the nature of Mrs. Mahoney's duties, it is not surprising that she and her husband also developed a personal relationship with Captain Alexander, periodically inviting him out to dinner.

4. The heirs sought to discredit Mr. Cerio's testimony, both by introducing evidence of a prior inconsistent statement allegedly made to D. Alexander and by suggesting that he had acted unethically as executor by purchasing real property from the estate. Neither attempt succeeded; the Court found Mr. Cerio's testimony credible and convincing on the issue at bar.

5. Because efforts to locate Ms. Peterson failed, and because her interests do not differ from the other potential heirs-at-law, she was not joined in this lawsuit.

was never particularly close to any surviving family member. None of the potential heirs came to visit Captain Alexander in the hospital in the months immediately preceding his death. And only Donald D. Alexander attended Captain Alexander's funeral.[6]

Following his death, Captain Alexander's will, dated April 28, 1986, was admitted to probate in the Circuit Court of the County of Arlington, Virginia. After providing for the payment of Captain Alexander's just debts, funeral expenses, estate administration costs, and estate and inheritance taxes, the will provided for monetary bequests to eleven specified individuals, including bequests of $50,000 each to Captain Alexander's half-nieces and nephews—Donald David Alexander, Nelson Earl Alexander, Julia Ann Farkas, and Mary Louise Brumbaugh. Captain Alexander's will did not provide for any of the surviving grand nieces or grand nephews. He devised the remainder of his estate to the Coast Guard Academy for the purpose of establishing a scholarship fund in his name and that of his half-brother George Alexander, also an Academy graduate. Paragraph THIRD of the will (the "Residuary Clause") provides as follows:

I hereby devise and bequeath all the remainder of my property, of every description and wherever located, that I now own or may hereafter acquire, to the UNITED STATES COAST GUARD ACADEMY LOCATED AT NEW LONDON, CONNECTICUT, FOR THE PURPOSE OF ESTABLISHING THE GEORGE C. ALEXANDER (CLASS OF 1904) AND ROBERT T. ALEXANDER SCHOLARSHIP FUND FOR EXCELLENCE IN CHEMISTRY AND PHYSICS, —THE ANNUAL NET INCOME FROM THE CORPUS OF THE SAID FUND IS TO BE AWARDED AND PAID TO THE GRADUATING CADET WHO HAS ATTAINED THE HIGHEST GRADE AVERAGE IN CHEMISTRY AND PHYSICS WHILE ENROLLED IN THE ACADEMY;

Pursuant to the terms of this Residuary Clause, Daniel Cerio, the executor of Captain Alexander's estate and drafter of the Will, delivered two checks to the Coast Guard following Captain Alexander's death. Cerio delivered the first check, in the amount of $1 million, to the Coast Guard in January 1990, and he handed over the second check, in the amount of $154,204.42, in April 1993. These checks have been deposited in the United States Coast Guard's General Gift Fund, and the proceeds of these checks are currently earning interest. According to recent estimates, the annual net income from the trust, and thus, the proposed annual award to the graduating Cadet attaining the highest grade point average in chemistry and physics will range between $65,000 and $130,000 (or perhaps higher), depending on fluctuations in interest rated and inflation. These estimates are based on a trust corpus of $1.3 million, and interest rates ranging from 5 to 10 percent.

Upon realizing the size of the annual award called for by the terms of the testamentary trust, the Coast Guard determined that it would not be able to accept the trust gift as written. The award of such a large cash prize, in the eyes of the Coast Guard, would disrupt the Academy's educational program and unduly interfere with its mission of preparing young men and women for a life of public service in the Coast Guard. As such, the government, on behalf of the Coast Guard, initiated this suit seeking application of the *cy pres* doctrine.

Testimony at trial from Admiral Versaw, the Academy's current Superintendent, and Captain Gronlund, the head of the Academy's Science Department, showed convincingly that an annual award of $65,000 to $130,000 to a cadet would have unacceptably deleterious effects on the Academy's operations and prevent the attainment of its mission.[7]

---

**6.** There is some indication that at least one other defendant heir who might have attended the funeral was physically unable to do so.

**7.** The record reflects that the Academy currently awards a number of cash prizes to reward academic and related achievements, but that these awards do not exceed $300 per cadet. According to Admiral Versaw, cash awards in this range are neither disruptive to the Academy, nor contrary to law.

Asked to describe the Academy's mission, Admiral Versaw, without hesitation, recited the following litany he and all other Academy graduates over the decades learned as part of their plebe year indoctrination.

> The Mission of United States Coast Guard academy is to graduate young men and women with sound bodies stout hearts, alert minds and a liking for the sea and its lore, and with that high sense of honor, loyalty and obedience which goes with trained initiative and leadership, well grounded in seamanship, sciences and the amenities and strong in the resolve to be worthy of the tradition of commissioned officers in the United States Coast Guard in the service of their country and humanity.

This mission, in Admiral Versaw's view, would be jeopardized if the proposed trust were enforced as written. Specifically, he noted that an annual award of $65,000 to $130,000 to a cadet would (i) engender intense, unhealthy competition among cadets, (ii) spawn honor code offenses, (iii) distort the competition to major in the sciences at the expense of other majors [8], (iv) erode, if not destroy, the class and interpersonal relationships and esprit de corps so vital to the Academy's goal of instilling in cadets the value of teamwork and (v) serve to teach cadets, wrongly, that the reward for a job well done in a life of public service in the Coast Guard is cash rather than the personal satisfaction that comes from doing well one's duty as an officer. No student of human nature can seriously doubt the validity of Admiral's views in this regard. Attempts at literal enforcement of the trust would fundamentally change the Academy in ways neither contemplated, nor desired by Captain Alexander.

## III.

### CONCLUSIONS OF LAW

Under Virginia law, the equitable doctrine of *cy pres* permits courts to alter a trust so as to carry out a testator's intent "as near as possible" when it is not possible to effectuate this intent in the exact manner specified by the testator. *See Va.Code* § 55–31 (1992).[9] For the doctrine of *cy pres* to be properly invoked, there must be: "(1) a valid charitable trust without a gift over, (2) an existing general charitable intent, *and* (3) the beneficiaries must be indefinite or uncertain, *or* (4) the purpose of the trust must be indefinite, impossible to perform, or so impracticable of performance as to characterize the fulfillment of the purpose as 'impossible.'" *Smith v. Moore*, 225 F.Supp. 434, 441 (E.D.Va.1963), *modified and remanded on other grounds*, 343 F.2d 594 (4th Cir.1965) (emphasis in original).[10] In this case, the

---

**8.** As the record reflects, the curriculum and the majors offered at the Academy have changed over time and will likely change in the future. At the moment, the Academy offers no physics or chemistry major. Instead, a major in Marine Science is offered. This major offers cadets the greatest opportunity to take physics and chemistry courses, of which there are currently about 10. Significantly, the Marine Science major was oversubscribed last year, with about a dozen cadets turned away. It takes little imagination to see that this situation would be exacerbated and the distribution of cadets among the various majors would be seriously distorted if an annual prize of $65,000 to $130,000 were to be awarded in physics and chemistry.

**9.** *Va.Code* § 55–31 provides, in pertinent part, as follows:

> When any ... person gifts, bequeaths, ... or devises any real or personal property in trust to or for any educational, charitable or eleemosynary purpose, the indefiniteness or uncertainty of the beneficiaries named in any instrument creating such a gift, bequest, ... or any devise, or the indefiniteness of the purpose of the trust itself, shall not defeat any trust and, if the trust is in other respects valid under the laws of this State, it shall be administered to conform as near as may be to the purpose for which created, or if impossible of performance for this purpose, for some other educational, charitable, benevolent or eleemosynary purpose. However, unless the maker of the trust has specifically designated some other body ... to determine what the purpose shall be ..., the determination of the purpose of the trust shall be made by a court of equity in the county or city wherein the property or the greater part thereof is located and the administration of the trust shall be under the direction of such court.

**10.** *See also* Restatement 2d Trusts § 399, which states:

> If property is given in trust to be applied to a particular charitable purpose, and it is or becomes impossible or impracticable or illegal to carry out the particular purpose, and if the settlor manifested a more general intention to devote the property to charitable purposes, the

Coast Guard argues that *cy pres* should be applied to save Captain Alexander's charitable bequest from failing because it cannot accept or perform the trust as written. Defendant heirs, for their part, argue that *cy pres* is inapplicable, and that the failure of the gift results in the trust funds passing to them by intestate succession. In light of the trial evidence, however, it is clear that the requirements for application of the *cy pres* doctrine are met.

■ First, the Residuary Clause of Captain Alexander's will unmistakably creates a valid charitable trust without a gift over. Under to Va.Code § 55–26.1, a valid "charitable" trust is created by a devise or bequest for education or for charitable purposes.[11] Instructive here is the Supreme Court of Virginia's expansive definition of "charity":

> A charity, in a legal sense, may be described as a gift to be applied, consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government. It is immaterial whether the purpose is called charitable in the gift itself, if it is so

described as to show that it is charitable. Generally speaking, any gift not inconsistent with existing laws which is promotive of science or tends to the education, enlightening, benefit or amelioration of mankind or the diffusion of useful knowledge, or is for the public convenience is a charity.

*Allaun v. First & Merchants Nat'l Bank,* 190 Va. 104, 108, 56 S.E.2d 83, 85 (1949); *Shenandoah Valley Nat'l Bank v. Taylor,* 192 Va. 135, 63 S.E.2d 786, 789 (1951). Given this definition, the proposed trust created by the Residuary Clause is a valid charitable trust because (i) its purpose is to benefit an indefinite number of cadets, *see Worcester County Trust Co. v. Grand Knight of Knights of Columbus,* 325 Mass. 748, 92 N.E.2d 579 (1950) (valid charitable trust exists where gift benefits indefinite number of persons such that gift is of common and public benefit); *Ashmore v. Newman,* 350 Ill. 64, 183 N.E. 1 (1932) (same); and (ii) the proposed trust lends itself to the advancement of education by encouraging academic excellence in chemistry and physics at the Academy. *Worcester County Trust Co.,* 325 Mass. 748, 92 N.E.2d 579. Indeed, 'where, as here, a bequest has been made to establish a fund for the giving of prizes for achievement in education, courts have uniformly held such a bequest to be a valid charitable gift.[12] More-

trust will not fail but the court will direct the application of the property to some charitable purpose which falls within the general charitable intention of the settlor.

**11.** "In the law of trusts, there is a real and fundamental distinction between a charitable trust [i.e., a trust for education or charitable purposes] and one devoted to mere benevolence [i.e., a private trust]." *Shenandoah Valley Nat. Bank v. Taylor,* 192 Va. 135, 63 S.E.2d 786, 789 (1951). A charitable trust is public in nature and is not subject to the rule against perpetuities, while a private trust is void if it offends this rule. *Id.*

**12.** *See e.g., Ashmore,* 350 Ill. 64, 183 N.E. 1 (trust to provide annual prize to highest ranking student of graduating class of a named high school held to be valid charitable trust); *In re Estate of Hawley,* 32 Misc.2d 624, 223 N.Y.S.2d 803 (1961) (scholarship fund created in residuary clause of testator's will found to be valid charitable trust provided for the payment of annual prizes to students who attained the highest yearly marks); *Worcester County Trust Co.,* 325 Mass.

748, 92 N.E.2d 579 (trust to provide annual prizes for literary compositions of students of Catholic colleges in New England held to be charitable trust); *In re Judd's Estate,* 242 A.D. 389, 274 N.Y.S. 902 (1 Dept.1934), *aff'd, In re Fifth Ave. Bank,* 270 N.Y. 516, 200 N.E. 297 (1936) (testamentary trust providing for annual payments to the person making the greatest advancement in the discovery of a cure for cancer held to be valid charitable trust).

Defendants' reliance on *Shenandoah Valley Nat'l Bank v. Taylor,* 192 Va. 135, 63 S.E.2d 786, 789 (1951) is misplaced. To be sure, Supreme Court of Virginia there held invalid a trust to provide semi-annual payments to be made at Easter and Christmas to school children in the first, second, and third grades. Such a trust, the court ruled, did not qualify as a charitable trust, even though the testator had directed that these payments be used in furtherance of the children's education. *Significantly,* however, these awards were distributed to all students in the first, second, and third grades *regardless* of their academic achievement or prowess. Moreover, the

over, no "gift over" exists in Captain Alexander's will—*i.e.*, no provision appears in the will directing an alternative disposition of the trust funds should the proposed trust fail. The absence of such a "gift over" further compels the conclusion that the proposed trust at issue here is a valid charitable trust. *See Smith v. Moore*, 225 F.Supp. at 444.[13]

The next inquiry is whether Captain Alexander possessed a general charitable intent to benefit education at the Academy, or whether he simply had a specific, charitable intent to benefit only those Academy graduates attaining the highest grade point averages in chemistry and physics. As a preliminary matter, it should be noted that courts, in construing the nature of a charitable gift, properly endeavor to find, a general charitable intent whenever possible. *Board of Trustees v. Unknown and Unascertained Heirs of Prince*, 311 N.C. 644, 319 S.E.2d 239, 242 (1984). By contrast, it is well established that courts will find a specific, charitable intent only where such intent is "clear, definite, and unambiguous." *Trammell v. Elliott*, 230 Ga. 841, 199 S.E.2d at 198–99 (1973). Equally well established is that in Virginia, "charitable gifts are viewed with particular favor by the courts and every presumption consistent with the language contained in the instruments. of gift will be employed in order to sustain them." *Moore*, 225 F.Supp. at 441. Put another way, once the charitable nature of a trust is established, all doubts will be resolved in favor of preserving its charitable character. *Id.* at 441–42. *Baliles v. Miller*, 231 Va. 48, 340 S.E.2d 805, 809 (1986); *Wellford v. Powell*, 197 Va. 685, 689, 90 S.E.2d 791, 795 (1956); *Owens v. Bank of Glade Spring*, 195 Va. 1138, 81 S.E.2d 565, 569 (1954); *Shenandoah*, 63 S.E.2d at 790; *Allaun*, 190 Va. 104, 109, 56 S.E.2d 83, 86 (1949); *Thomas v. Bryant*, 185 Va. 845, 852, 40 S.E.2d 487, 490 (1946); *Collins v. Lyon, Inc.*, 181 Va. 230, 247–48, 24 S.E.2d 572, 580 (1943).[14]

Given this, the crucial question that must be answered to ascertain the nature of Captain Alexander's charitable intent is whether (i) he would have preferred that his bequest be applied to a like charitable purpose in the event that his original scheme failed, or (ii) would he instead have desired that the unused funds be removed from charitable use entirely. *Wesley United Methodist Church v. Harvard College*, 366 Mass. 247, 316 N.E.2d 620, 624 (1974). In light of the evidence offered at trial, it is clear that if Captain Alexander were alive today, he "probably would not direct that [the residue of his estate] be delivered to distant relatives in the event of the failure of the specific purpose set forth in his will." *Moore*, 225 F.Supp. at 439.[15] Instead, Captain Alexander most likely would have preferred that the remainder of his estate be used for closely related charitable purposes if the precise terms of his original scheme could not be carried out.

awards were paid immediately preceding two holidays. Thus, the court concluded that (1) "[nothing toward the advancement of education is attained by the ultimate performance by the trustee," and (2) the testator's purpose and intent were "to bestow upon the children gifts that would bring them happiness on the two holidays." 63 S.E.2d at 791. Captain Alexander's gift is quite different; it clearly lends itself to the advancement of education by encouraging academic achievement and prowess in chemistry and physics. *Shenandoah* is therefore inapposite.

13. That the Internal Revenue Service and the Virginia Department of Taxation approved the federal and state tax returns filed by the executor of Captain Alexander's estate relating to the trust funds has no bearing on the Court's determination of the charitable nature of the proposed trust. Contrary to the government's arguments, whether a testamentary gift is a valid charitable trust is properly a decision for the courts, not for agencies of the state or federal government.

14. *See also In re Carper's Estate*, 67 A.D.2d 333, 336, 415 N.Y.S.2d 550, 554 (4 Dept.1979), *aff'd*, 50 N.Y.2d 974, 431 N.Y.S.2d 468, 409 N.E.2d 941 (1980) (charitable trusts do not need the same degree of certainty as to the beneficiaries that other gifts do, and a charitable gift should be sustained whenever possible under the *cy pres* doctrine in light of the intention of the testator); *In re Lamb's Estate*, 19 Cal.App.3d 859, 865, 97 Cal.Rptr. 46, 50 (1971) ("We start with the principle that gifts to charity are highly favored and will be liberally construed to uphold their validity whenever possible.")

15. *See also Trammell*, 199 S.E.2d 194 at 198 (the existence of a general charitable intent is inferred upon the establishment that the proposed gift conforms in subject matter to any of the legitimate subjects of charity).

Indeed, Captain Alexander's general, charitable intent is made manifest by the express language of the will itself. As noted, the Residuary Clause reads, in pertinent part:

> "I hereby devise and bequeath all the remainder of my estate ... *to the UNITED STATES COAST GUARD ACADEMY* FOR THE PURPOSE OF ESTABLISHING THE GEORGE C. ALEXANDER (CLASS OF 1904) AND ROBERT T. ALEXANDER (CLASS OF 1931) SCHOLARSHIP FUND...." (emphasis added).

Significantly, the express terms of the Residuary Clause direct the remainder of Captain Alexander's estate to be given "to the United States Coast Guard Academy" for the purpose of establishing a scholarship fund to provide an annual cadet award for excellence in chemistry and physics. Fairly construed, this language makes clear that Captain Alexander intended the Academy to be the beneficiary of his largesse, and that the particular manner in which the trust was to be performed was secondary to his dominant, general charitable intent to encourage academic excellence at the Academy in chemistry and physics.[16]

The absence of any "gift over" provision in the will further supports this conclusion. No alternative disposition for the trust corpus appears anywhere in the Residuary Clause, nor does any alternative disposition appear elsewhere in the will. It is well established that

> "[t]he absence of a provision for forfeiture in case of noncompliance with a direction in a will with regard to a charitable trust is an indication that the testator did not intend that the gift should revert on failure to comply therewith while the carrying out of his general purpose is practicable."

*Moore*, 225 F.Supp. at 444.[17] Further evidence of this intent arises from the fact that Captain Alexander made specific, testamentary bequests of $50,000 to each of the half nieces and nephews. These specific, substantial bequests, coupled with the absence of a gift over provision in the will, are convincing proof that Captain Alexander would have wanted the residue of his estate to be used to further education at the Academy, even if the precise trust terms could not be effectuated. *Cf. Wachovia Bank and Trust Co. v. Buchanan*, 346 F.Supp. 665, 668 (D.D.C.1972) *aff'd without op.*, 487 F.2d 1214 (1973) (where relatives are excluded from a will and a bequest is made for charitable purposes, there is a strong presumption that the settlor did not desire that the relatives have more).[18] Clearly then, one need not look beyond the four corners of the will document to discern Captain Alexander's general charitable intent.

---

**16.** That Captain Alexander designated a specific institution through which education would be fostered does not undermine the general, charitable nature of his intent. As the *Moore* court stated:

> A general charitable intent is not limited to intent to do 'charity in general.' * * * A general charitable intent exists in any case where there is an intent to assist a certain general type of charity of kind of charity. If such intent exists, any means specified by the settlor is deemed his preference for dispensing the general kind of charity he has chosen to aid. And a general charitable intent is negative only where it is determined that the settlor's intent was to aid that kind of charity only in a particular way or by a particular method or means, that he intended to make no gift to that general kind of charity other than by specified particular means, that the intended that, if specified particular means failed, the gift failed, and the corpus of the trust could no longer be used for the general type or charity he desired to assist.

*Moore*, 225 F.Supp. at 443 (quoting *Ramsey v. City of Brookfield*, 361 Mo. 857, 237 S.W.2d 143 (1951).

**17.** *See also In re Carper's Estate*, 67 A.D.2d 333, 336, 415 N.Y.S.2d 550, 554 (4 Dept.1979), *aff'd*, 50 N.Y.2d 974, 431 N.Y.S.2d 468, 409 N.E.2d 941 (1980) (lack of gift over is evidence of general charitable intent); *In re Lamb's Estate*, 19 Cal.App.3d 859, 867, 97 Cal.Rptr. 46, 51 (1971) (absence of gift over is factor militating in favor of application of *cy pres*); *Worcester County Trust Co.*, 92 N.E.2d at 582 (general charitable intent found where the trust did not contain a provision for a gift over in the event trust failed); *Winslow v. Stark*, 78 N.H. 135, 97 A. 979, 980 (1916) (general charitable intent found where the trust did not contain an express provision for reverter).

**18.** *See also Baliles v. Miller*, 231 Va. 48, 340 S.E.2d 805, 810 (1986) ("courts are decidedly adverse to adopting any construction of a will which leave a testator intestate as to any portion of his estate unless compelled to do so").

Even assuming, *arguendo*, that such intent cannot be clearly discerned from the will itself, an examination of Captain Alexander's professional career and educational background supports a finding that he possessed a general, charitable intent to benefit the study of science, particularly of physics and chemistry, at the Academy. *See Moore*, 225 F.Supp. at 442 ("[t]he background of the testator, ... his education and business acumen, may all be considered in determining his general charitable intent, unless the same is precluded by the precise language of the will"). As noted above, Captain Alexander spent his entire professional career in the Coast Guard, serving for a time as an Academy physics and chemistry instructor and as the Head of the Chemistry Department. Moreover, his pronounced interest in the sciences is further evident in his receipt of two additional degrees, a Masters degree in Physics from the University of Michigan and another Bachelors degree in engineering from the George Washington University. Also pertinent is that, as Captain Alexander rose through the ranks of the Coast Guard, he occupied various billets that called upon his scientific background and expertise. In addition, he was a member of the American Society of Civil Engineers, the Society of Naval Engineers, and the American Society of Military Engineers. Nor can there be any serious doubt that Captain Alexander had a deep and abiding love for the Coast Guard and the Academy. His post-retirement attachment to the Coast Guard is apparent from his relatively regular attendance at Coast Guard meetings and functions. It is accordingly clear that Captain Alexander possessed the requisite general intent to have the residue of his estate applied to charitable ends, namely the encouragement of academic excellence in the sciences at the Academy. It is equally clear that "he would attach so much more importance to the object of the gift than to the mechanism by which he intended to accomplish it that he would prefer to alter the mechanism to the extent necessary to save the object." *Worcester County Trust Co.*, 325 Mass. at 754, 92 N.E.2d at 583.[19]

■ But the *cy pres* analysis does not end here; a final issue must be resolved as *cy pres* applies only where a charitable trust is "indefinite, impossible to perform, or so impracticable of performance as to characterize the fulfillment of the purpose as 'impossible.'" *Moore*, 225 F.Supp. at 441. In this regard, the Coast Guard argues that, as written, the trust is fatally indefinite and legally, as well as practically impossible to perform. The indefiniteness argument, while not without same force, is not, in this context, an adequate predicate for the application of *cy pres*. Any ambiguities in the trust as written here could be resolved in a traditional action for aid and guidance of the Court.[20] [cite] The focus here, therefore, is on the Coast Guard's contentions (1) that the trust, as written, is impossible to perform because the law precludes the Coast Guard from giving cadets large cash prizes and (2) that the trust, as written, cannot achieve the testator's purposes because it would be so destructive of the Academy's operations and mission that it must be refused unless reformed.

■ *Cy Pres* does not require literal impossibility. That the Academy could conceivably carry out the terms of the trust does not bar application of the doctrine. It is enough that the gifts essential impracticality precludes performance. *See Wesley United Methodist Church v. Harvard College*, 366 Mass. 247, 316 N.E.2d 620 (1974) (*cy pres* can be applied even when a charitable trust is theoretically capable of performance); *Dun-*

---

19. *See also Moore*, 225 F.Supp. at 443 (if the intention of the testator can to some extent be carried into effect, the method selected by the testator should be subordinated to the general purpose); *In Estate of Hawley*, 223 N.Y.S.2d at 806 (the mode of carrying out the charitable purpose is subordinate to the charitable purpose of the trust)

20. Thus, the Coast Guard argues that interpretive problems would arise in selecting the cadet "who has attained the highest grade average in chemistry and physics while enrolled at the Academy." For example, it is unclear how many and which physics and chemistry, *inter alia*, the courses a cadet would need to have taken to be eligible for the award. But these and other ambiguities could be resolved in the context of an aid and guidance suite and without the need for *cy pres*.

bar v. Board of Trustees, 170 Colo. 327, 461 P.2d 28, 30 (1969) ("A purpose becomes impracticable when it appears under the circumstances the application of property to that designated purpose would fail to accomplish the general charitable intention of the testator").

Particularly instructive in this regard is the New Jersey Supreme Court decision in Howard Sav. Institution v. Peep, 34 N.J. 494, 170 A.2d 39 (1961). In that case, the testator bequeathed money to Amherst College to be held in trust "to be used as a scholarship loan fund for deserving American born, Protestant, Gentile boys of good moral repute, not given to gambling, smoking, drinking, or similar acts."[21] Amherst College desired to accept the gift, but only if it could do so free of the religious restrictions which, while not illegal, were contrary to the College's policies. The potential heirs-at-law argued that if Amherst did not want to perform under the trust as written, the trust failed and its funds passed to them under intestate succession.

On these facts, the Supreme Court of New Jersey held that the doctrine of cy pres was applicable, and permitted Amherst to accept the gift free of religious restrictions. The court based its decision on a finding that such a result was closer to the testator's intent than was the proposal to give the trust funds to the heirs. Also cited in support of the ruling were specifically, the following findings: (1) the will contained no provisions for alternative control of the trust in the event the trust was not accepted by the College; (2) the testator had attended and graduated from Amherst; and (3) the only persons who could inherit in the event of intestacy were cousins with whom the testator had not had personal relations. [cite] Howard and the case at bar are strikingly similar. Both cry out for the application of cy pres.

In this case, the award of an annual cash prize ranging from $65,000 to $130,000 to a single cadet would plainly violate Academy policy. As Admiral Versaw's persuasive testimony made pellucidly clear, an annual award of this magnitude would wreak such havoc on the Academy that the Coast Guard would be compelled to refuse the gift in the absence of any change in its terms. The Academy, like the other service academies, strives to prepare young men and women for the challenges of public service, not only through academic preparation, but by building and maintaining a reverence for honor, a commitment to teamwork and an esprit de corps. Were cadets aware that achieving the highest grade point average in chemistry and physics would result in large monetary remuneration, the serious consequences anticipated by Admiral Versaw would doubtless come to pass. Given this, and in light of the Coast Guard's position that it would refuse the Captain Alexander's bequest rather than perform the trust as written, the gift is "so impracticable of performance as to characterize the fulfillment of [Captain Alexander's specific] purpose as 'impossible.'" Moore, 225 F.Supp. at 442.[22]

21. One wonders whether today a gift with such stringent morality requirements would approach literal impossibility of performance.

22. Given this conclusion, the Court need not reach the Coast Guard's argument that it is precluded by law from awarding any more than a modest or nominal cash prize to a cadet. Nonetheless, it is worth noting that this argument has considerable force. Section 503 of Title 14, United States Code, appears to prohibit the Coast Guard from awarding large sums of cash as an award for service and achievement. 14 U.S.C. § 503 states that:

The Coast Guard may award trophies, badges, and cash prizes to Coast Guard personnel ... for excellence in accomplishments related to Coast Guard service, to incur such expenses as may be necessary to enter such personnel in competitions, and to provide badges or buttons in recognition of special service [and] good conduct.

While this statute does not, by is express terms, limit the amount of "cash prizes," the application of the doctrine of ejusdem generis supports a finding that, fairly construed, the statute authorizes awards of only modest value, e.g., trophies, badges, and buttons. Under this statutory construction doctrine, when a particular class of things is enumerated in a statute, and general words follow, such general words are not to be construed broadly, but are to be held as applying only to things of the same general kind or class as those specifically mentioned. Hilton v. Southwestern Bell Telephone Co., 936 F.2d 823, (5th Cir.1991), cert. denied, —— U.S. ——, 112 S.Ct. 913, 116 L.Ed.2d 813 (1992); Berniger v. Meadow Green–Wildcat Corp., 945 F.2d 4, 8 (1st Cir.

IV.

In sum then, it is clear: (i) that the proposed trust set forth in Captain Alexander's will is a valid charitable trust; (ii) that Captain Alexander possessed a general, charitable intent; and (iii) that it is "impossible" to carry out the precise terms of this proposed trust. Accordingly, application of *cy pres* doctrine is manifestly appropriate here· so that "defects in the trust may be cured, beneficiaries selected and determined upon, purposes for the trust supplied, and suitable plans and details of execution and administration adopted". *Shenandoah*, 63 S.E.2d at 794–95. Importantly; courts undertaking to alter trusts pursuant to the *cy pres* doctrine must be mindful that their discretion is not unlimited. Rather, their discretion is limited and guided by the principle that preservation of the testator's purposes is paramount and that alterations to the trust fashioned to eliminate any impossibility or impracticality of performance, must, as much as possible, result in a trust that effectuates the testator's original purposes. With this guiding principle in mind, the Court concludes that the terms of the trust must be altered to provide as follows:

1. The corpus of the reformed trust shall remain in the Coast Guard General Gift Fund pursuant to 10 U.S.C. § 2601(b)(4). The corpus shall be known as the "George C. Alexander (Class of 1904) and Robert T. Alexander (Class of 1931) Academic in Excellence in the Sciences Fund." The reformed trust shall be maintained in perpetuity;

2. The Coast Guard shall be the trustee of the trust and the Academy will be the beneficiary of the trust;

3. The annual net income of the reformed trust shall be applied as follows:

a. (i) First, a cash award of $750 shall be awarded to the graduating cadet or cadets who attain the highest cumulative grade point average in four or more physics courses taken during the cadet's four years at the Academy. To be eligible for this award, a cadet must take at least four physics courses over a four year Academy career. The Superintendent, with the advice of the Head of the Science Department, shall determine from time to time which Academy courses qualify as physics courses. A cadet's senior project in science, if substantially involving physics, may be included as a physics course for purposes of this award. This award is to be called the "George C. Alexander, Class of 1904 and Robert T. Alexander, Class of 1931 Prize in Physics". Funds from the trust are also to be used to purchase and install a plaque to be placed in an appropriate location at the Academy entitled, "The George C. Alexander, Class of 1904 and Robert T. Alexander, Class of 1931 Prize Winners·in Physics." The name of each prize recipient is to be inscribed or engraved on the plaque. The case amount of this award may be increased from time to time at the direction and discretion of the Superintendent.

(ii) A cash award of $750 shall be awarded to the graduating cadet or cadets who attain the highest cumulative grade point average in four or more chemistry courses taken during the cadet's four years at the Academy. To be eligible for this award, a cadet must take at least four chemistry courses over a four year Academy career. The Superintendent, with the advice of the Head of the Science Department, shall determine from time to time which Academy courses qualify as chemistry courses. A cadet's senior project in science, if substantially involving chemistry, may be included as a chemistry course for purposes of this award. This award is to be called the "George C. Alexander, Class of 1904 and Robert T. Alexander, Class of 1931 Prize in Chemistry". Funds from. the trust are also to be used to purchase and install a plaque to be placed in an appro-

1991); *Martin v. Commonwealth of Virginia*, 224 Va. 298, 295 S.E.2d 890, 892 (1982). Applied here, this statutory construction doctrine compels the conclusion that the general term "cash prizes" should be construed to encompass only cash awards similar in nature to those enumerated by the preceding specific terms, namely trophies and badges. As such, the Academy may be limited in the amount of monetary compensation it can bestow on a single cadet.

priate location at the Academy entitled, "The George C. Alexander, Class of 1904 and Robert T. Alexander, Class of 1931 Prize Winners in Chemistry." The names of all recipients of this prize are to be inscribed or engraved on the plaque. The cash amount of this award may be increased from time to time at the direction and discretion of the Superintendent.

b. Second, modest cash awards of $400 each shall be awarded annually to the cadet or cadets who attain the highest grade in each of the chemistry and physics courses offered at the Academy at any point in time. These awards are to be known as the "George C. Alexander (Class of 1904) and Robert T. Alexander (Class of 1931) Excellence in Chemistry and Physics Awards." One award of $400 will be established for each current chemistry and physics class, the number of awards to increase or decrease in subsequent years to correspond to future curriculum changes. Recipients of these awards will be selected annually, and all cadets at the Academy enrolled in these classes will be eligible for the prizes. The cash amount of these awards may be increased from time to time at the direction and discretion of the Superintendent.

c. Third, each year up to a total of $5000 of trust funds will be available to be awarded to one or more cadets to support senior projects in science. Recipients of these grants will be selected by the Superintendent, with the advice of the Academy's science faculty. Winners of these research grants will be selected on the basis of applications by cadets setting forth in appropriate detail the nature, scope and purpose of a science project to be undertaken and completed during the senior year. Applications for research grants must be submitted at a date during junior year to be set at the discretion of the Superintendent. The Superintendent may also publish more detailed criteria to guide cadets in the completion of applications for the research award. Also the number of research grants awarded may vary from year to year depending upon the level of interest among cadets and the quality and merit of the applications. Grant funds may only be used to defray expenses incurred directly in connection with the subject science project. These expenses may include payment for the purchase, repair or rental of machinery or equipment, the purchase of books, travel and miscellaneous administrative costs. Because these expenses may vary from project to project, the amount of each grant may vary at the discretion Superintendent in order to accommodate the requirements of the particular proposed project.

d. Fourth, up to $40,000 annually shall be available to establish the "Robert T. Alexander Coast Guard Academy Science and Teaching Graduate Fellowship" to fund the graduate studies of a Coast Guard Academy graduate who, following at least one tour of sea duty, wishes to pursue a Ph.D in the sciences, preferably chemistry or physics, and then return to the Academy to serve as an instructor. To be eligible, a Coast Guard officer must be an Academy graduate who is on active duty and who has served at least one tour of duty at sea. The Superintendent of the Academy, with the advice of the Academy faculty, shall select qualified Coast Guard Officers for the graduate fellowship on the basis of academic excellence, intellectual prowess, leadership, dedication and interest in the sciences, commitment to a career in the Coast Guard, and sincere desire to serve as an instructor at the Academy. Recipients of this fellowship are to be selected as often as the Superintendent of the Academy deems appropriate or necessary, although at least one recipient must be designated at least once every five years. Recipients of the fellowship are to receive tuition, expenses, and an appropriate stipend to fund their graduate studies. A plaque is

to be placed in an appropriate location at the Academy in memory of Robert T. Alexander upon which the names of all recipients of the fellowship award are to be inscribed or engraved.

e. Fifth, up to $7,500 of trust funds shall be available annually to allow the Academy to invite distinguished professors, researchers and lecturers in the sciences from other universities and institutions to visit the Academy for the purpose of providing further instruction to cadets in science. These visiting professors, researchers or scientists shall be paid an appropriate honorarium plus their expenses and each shall be given the title of "Robert T. Alexander Visiting Fellow." Fellowship recipients will be selected from other universities and institutions on the basis of their potential to enhance cadets' understanding of science, in general and also the role of science in the formulation of sound public policy. It is contemplated that there may be more than one Robert T. Alexander Visiting Fellow per year and selected Fellows may remain at the Academy for periods of up to two weeks.

f. Sixth, any trust funds remaining in a given year after funding all of the various awards, prizes, grants and fellowships described in paragraphs (a) through (e), above, may be used to purchase or repair special scientific equipment or machinery, at the discretion of the Superintendent, with the advice of the science faculty. Trust funds may be expended only in connection with machinery or equipment that will be used directly by cadets in connection with their science studies. Each piece of machinery or equipment purchased shall include a permanent plaque or label identifying it as a "Gift of Robert T. Alexander, Class of 1931."

4. Finally, the Superintendent is directed to communicate by letter annually with a designated member or representative of the surviving members of Captain Alexander's family to advise them of the details of the disposition of trust funds for the year. Specifically, the Superintendent's letter should identify the recipients of all prizes, awards and fellowships and provide such additional information as may seem appropriate such as hometowns, ages, academic major, nature of study project, titles and copies of lectures given, physics or chemistry grades and, in the case of any equipment purchased, a description of the nature, uses and location of that equipment.[23] Donald D. Alexander is designated as the family representative and he shall have the discretion and authority to designate his successor in this capacity, which designation should be sent in writing to the Superintendent. Should it occur in the future that no representative is designated, the Superintendent is to undertake to locate a surviving family member to whom the report may be sent. For this effort, the Superintendent may expend up to $2000 of trust funds. Only if no family representative is located may this reporting requirement be omitted.

This alteration of the trust terms is fully in keeping with the spirit of Captain Alexander's charitable intent, and Captain Alexander undoubtedly would have approved the modification.

An appropriate order shall issue.

---

23. Of course, it is open to the Superintendent to invite family members to the Academy to attend or participate in any ceremony at which any prizes, grants, awards or fellowships are bestowed.